# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| SUCCESS SYSTEMS, INC., SMART C-STORES, LLC,<br>    *Plaintiffs*,<br><br>v.<br><br>EXCENTUS CORP., SKUPOS, INC.,<br>    *Defendants*. |

No. 3:19-cv-455 (VAB)

## RULING AND ORDER ON MOTIONS TO DISMISS

Success Systems, Inc. and Smart C-Stores, LLC ("Success Systems," "Success," or "Plaintiffs") have sued Excentus Corp. ("Excentus") and Skupos, Inc. ("Skupos") (collectively, "Defendants") under §§ 1 and 2 of the Sherman Act, § 3 of the Clayton Act and Connecticut causes of action.

Any state law claims against Excentus will be dismissed because the Court lacks jurisdiction over them. While venue also is improper for these state law claims, because the Court lacks jurisdiction over them and they are dismissed, no further action by this Court is necessary. The federal antitrust claims against Excentus will be dismissed on the merits.

As to Skupos, the federal antitrust claims against them also will be dismissed. Having dismissed the federal claims against them, the Court declines to exercise supplemental jurisdiction over any state law claim against Skupos and that claim will be dismissed as well.

Excentus's motion to dismiss for failure to state a claim or in the alternative transfer venue is **GRANTED** to the extent Excentus argues Success Systems failed to state a claim; the motion is **MOOT** to the extent Excentus seeks to transfer venue. Excentus's motion to dismiss

for lack of jurisdiction and improper venue is **GRANTED**. Skupos's motion to dismiss for failure to state a claim is **GRANTED.**

For the following reasons, all motions to dismiss are **GRANTED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Factual Allegations

Success Systems, a corporation based in Connecticut, alleges that this Court has jurisdiction under 28 U.S.C. §§ 1337, 1331, 1367 as the "case arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Section 3 and 4 of the Clayton Act" and the Court may exercise supplemental jurisdiction over the state law claims accordingly. Am. Compl. ¶ 5.  The Court also allegedly has jurisdiction under 28 U.S.C. ß 1332 and venue is allegedly proper under 28 U.S.C. § 1391, Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.  *Id*. ¶¶ 6-7. The Court allegedly "has personal [j]urisdiction over the Defendants as a substantial part of the events or omissions giving rise to the claims occurred in Connecticut, Defendants have transacted a substantial amount of business in Connecticut" and the harm from Defendants' anticompetitive and tortious conduct was felt in Connecticut. *Id*. ¶ 8.

#### 1.      The Parties

Success Systems "offers automation solutions for convenience, grocery, liquor, tobacco and gasoline service stations (collectively 'C-stores') across the country." Am. Compl. ¶ 9. One of its programs "is a tobacco loyalty program named 'Smokin' Rebates®.'" *Id*. Success Systems alleges that "Smokin' Rebates is the most diversified and complete solution for compliancy-based rebate reporting system through which major tobacco manufacturers . . . offer rebates to C-store owners who agree to share tobacco sale and scan data from their stores." *Id*. ¶ 10. The program allegedly allows participants "to charge their customers as much as $2 per pack of

cigarettes less than other C-stores" that do not enroll or engage in the tobacco rewards program. *Id*. ¶ 11.

The savings allegedly are important to C-stores because tobacco suppliers have reported "a 6-11% drop in tobacco category sales for retailers" that do not participate in the rebate programs. *Id* ¶ 12. Even with declining smoking rates, C-stores allegedly "report that they still derive upwards of 50-65% of their revenue from tobacco products," making the lower priced packs of cigarettes "a critical competitive advantage." *Id*. ¶ 13.

"Smokin' Rebates [allegedly] is one of the few providers of the tobacco rewards programs and is compatible with 13 Point of Sale ("POS") registers" C-stores often use. *Id* ¶ 14.

Excentus "develops and operates loyalty programs[.]" *Id.* ¶ 15. Fuel Rewards, a program operated in conjunction with Shell Oil, allegedly is Excentus's flagship product. *Id*. Fuel Rewards allegedly "gathers all data relating to the sale of fuel and all products sold at Shell service stations, including tobacco products" and then provides the data to Shell. *Id*. ¶ 16. According to Success Systems, "Excentus does not offer or support the tobacco loyalty programs provided by the major tobacco manufactures." *Id*. ¶ 17.

For a Shell service station to participate in a tobacco loyalty program, the service station would allegedly require Excentus "to provide the POS data for all tobacco sales to the tobacco loyalty program provider[.]" *Id*. ¶ 18. This is because "Excentus' Fuel Rewards system [allegedly] is the only system that can gather and provide this data in a Fuel Rewards Shell service station." *Id*.

Johnson Oil allegedly "owns and operates several Shell service stations in Illinois and Iowa[.]" *Id*. ¶ 19. Johnson Oil allegedly participates in the Excentus-operated Fuel Rewards program. *Id*.

## 2. Alleged Oral Contract

In 2017, Johnson Oil allegedly began working with Success Systems to use "several of its back-office productivity solutions . . . ." *Id*. ¶ 20. In September 2018, Johnson Oil allegedly "decided that it would like to participate in the tobacco loyalty rewards program, and asked Success to implement its Smokin' Rebates program in the Johnson Oil Shell service stations." *Id*. ¶ 21. Excentus allegedly agreed to provide Success Systems with the Fuel Rewards data, in order for the tobacco rebate program to work. *Id*. ¶ 22. Excentus allegedly "contacted Success in Connecticut" which allegedly began "the relationship between the parties which led to the agreement to integrate their respective programs." *Id*.

During that initial call and on subsequent calls, Excentus allegedly "agreed to provide the required data and agreed to integrate Smokin' Rebates with the Shell Fuel Rewards program for Johnson Oil, and the Shell Fuel Rewards program in general[.]" *Id*. ¶ 23. The integration allegedly "would make the Smokin' Rebates available to all Shell Fuel Rewards users." *Id*.

According to Success Systems, this was an "oral agreement made between representatives for Excentus—with at least apparent authority—and representatives from Success." *Id*. ¶ 24. Numerous e-mails sent between the parties allegedly "documented the agreement," *id.* ¶ 25, and "provide evidence of the agreement between the parties, as does Excentus' willingness to provide its confidential data to Success as well as its willingness to provide extensive support for integration," *id*. ¶ 26. The effort in the following months that required cooperative work, the e-mails, and the practice and conduct of the parties allegedly demonstrates "a meeting of the minds and an agreement." *Id*. ¶ 27. Although the agreement "did not provide for any payments either from Excentus to Success or vice versa, it nonetheless bears all the hallmarks of an oral contract." *Id*. ¶ 28.

Allegedly, in exchange for providing the Fuel Rewards data to Success Systems, Excentus obtained "the ability to advertise to other locations . . . that if they subscribed to Shell Fuel Rewards, they would now also be able to take advantage of the lucrative Smokin' Rebates tobacco rewards program." *Id*. ¶ 29.

Altria Group, a major tobacco manufacturer, *id*. ¶ 10, has data which indicates providers of loyalty solutions, like Excentus, "are having a difficult time competing in the marketplace without rebate reporting module[s]," especially considering the current high demand of rebate programs, *id*. ¶ 30. An integration of the systems allegedly "made Fuel Rewards more valuable to Shell station owners." *Id*.

The allegedly competitive advantage "a tobacco rewards program provides C-store operators[,]" and Excentus's potential "ability to provide such a program as a part of Fuel Rewards was a direct and a real and direct benefit to Excentus." *Id*. ¶ 31. Success Systems also alleges that Excentus's conspiracy "to replace Success with another tobacco rewards provider" before implementing Smokin' Rebates in sixty-eight Johnson Oil locations further demonstrates "the value Excentus placed on the service that Success was providing." *Id*. ¶ 32.

Success Systems allegedly would have benefitted from a partnership with Excentus "by securing set and subscription fees" from the initial sixty-eight Johnson Oil locations "and then from other Shell Fuel Rewards locations." *Id*. ¶ 33.

Success Systems and Excentus allegedly discussed expanding the Smokin' Rewards program to Excentus's "other non-rewards Shell locations beyond the Johnson Oil stores." *Id*. ¶ 34. Both allegedly had begun installing "Smokin' Rewards at another Fuel Rewards location[s]. . . . " *Id*. ¶ 35.

Over a month before Excentus allegedly breached its agreement with Success Systems, Success Systems allegedly "published several announcements on prominent social media platforms advertising that it had integrated Smokin' Rebates with the Shell Rewards network[,]" relying on Excentus that full integration was on the horizon. *Id.* ¶ 36. Excentus allegedly objected to the post for the first time then. *Id.*

Success Systems alleges that Excentus's late-hour objection to its announcement "is further evidence of the agreement to make Smokin['] Rewards available to all Fuel Rewards locations after" after integration to the platforms was complete. *Id.* ¶ 37.

### 3. Parties' Performance

Between November 2018 and March 2019, "Excentus [allegedly had] worked hand in hand with Johnson Oil, Success, and a company called IRI (which certified data for the Altria tobacco loyalty program) to integrate Smokin' Rebates into the Fuel Rewards program." *Id.* ¶ 38.

Through the process of integration, Excentus, Success Systems, and Johnson Oil allegedly exchanged hundreds of e-mails. *Id.* ¶ 39. Success Systems points to language in e-mails between Success Systems and Excentus allegedly demonstrating the agreement between the two:

- On November 16, 2018, Jamie Hudson, VP at Excentus, allegedly received an e-mail from Kathy Peugh stating "they decided to implement Success' Smokin' rebates program." Mr. Hudson allegedly responded, "have them give me a call we can share a file with them and probably get this going pretty quickly." *Id.* ¶ 40(a);

- On January 18, 2019, Anthony Lezzi at IRI allegedly e-mailed Henrik Ampel at Excentus "requesting that Excentus provide Success with the export files necessary for Success to start getting Smokin' Rebates running at the Johnson Oil locations." *Id.* ¶ 40(b). Mr. Ampel allegedly replied to the "Team" "and provided login credentials to the Excentus SFTP server." *Id.*;

- On January 30, 2019, Andrew Iorio at Success Systems allegedly wrote to Todd Kuhlmeyer at Excentus. *Id.* ¶ 40(d). Mr. Iorio allegedly requested "the StoreSiteID for each of the stores, so I can confirm that we are getting all the stores." *Id.* Mr. Kuhlmeyer allegedly provided "a list of each Johnson site with address and site ID." *Id.*;

- On February 15, 2019, Johnson Oil's Rolando Ducoing allegedly sent an e-mail to Success Systems personnel and Mr. Kuhlmeyer approving of a starting with a specific test cite "for a few days before going live everywhere is a great idea." *Id*. ¶ 40(c); and

- On February 26, 2019, Mr. Ducoing allegedly sent an e-mail to Success Systems informing they "[were] live now[,]" and that they could "run the rewards at store 4 [possibly the above referenced test site] for a couple of days for verification before opening it up to everyone." *Id*. ¶ 40(e).

Success Systems allegedly relied on its agreement with Excentus before entering into a written agreement with Johnson Oil requiring Success Systems to "implement the Smokin' Rewards program in all Johnson Oil locations." *Id*. ¶ 41. As consideration, allegedly "Johnson Oil agreed to pay Success to set up the program and also to administer the program on a monthly basis." *Id*. Success Systems and Johnson Oil allegedly "spent considerable time, effort, and capital in coordinating the setup, implementation, and testing of Smokin' Rebates in conjunction with the Excentus Fuel Rewards program." *Id*. ¶ 42. Following the Johnson Oil rollout, Excentus allegedly "asked if Fuel Rewards could be installed in 18 Johnson Oil BP locations . . . ." *Id*. ¶ 43. Excentus allegedly "offered to provide a price quotation." *Id*.

By March 2019, allegedly "Excentus had provided Success with general data for all 68 Johnson Oil locations, and specific testing data for Johnson Oil location #4[.]" *Id*. ¶ 44. And in early March 2019, an allegedly successful test of the Smokin' Rebates/Fuel Rewards integration occurred. *Id.*

According to Success Systems, "information was attached directly to emails that were sent from Excentus in Texas to Success in Connecticut, and . . . Excentus provided Success with login credentials to its internal FTP server and invited Success to login and download the data from Texas to Connecticut." *Id*. ¶ 45.

No in-person meetings occurred between the two companies or "employees or representatives of either company." *Id*. ¶ 46. "All of the communication between Excentus and Success took place over the phone or via email[.]" *Id*.

### 4.     The Aftermath

Success Systems alleges that, "unbeknownst to Success or Johnson Oil, Excentus had been working for some time behind[] the scenes" with Skupos, an alleged competitor of Success Systems. *Id*. ¶ 47. Excentus allegedly sought "to provide a tobacco reward program to its clients (including Johnson Oil) in conjunction with Fuel Rewards and in violation [of] its agreement with Success." *Id*. Excentus allegedly worked to "to conspire and breach the agreement" with Success Systems "to give the tobacco rewards business to Skupos." *Id*. ¶ 48.

Success Systems alleges that "while some personnel at Excentus [worked] hand in hand with Success, Johnson Oil, IRI, and Altria pursuant to the agreement to implement tobacco rewards alongside Shell Fuel Rewards, other or the same people at Excentus" worked to conspire and breach the agreement with Success Systems to "give the tobacco rewards business to Skupos." *Id.* ¶ 48.

Through conspiring and collaborating, "Skupos and Excentus [allegedly] were knowingly and tortuously interfering with the business expectancies and contractual relationships between Success and Johnson Oil, and between Success and Excentus." *Id*. ¶ 49.

Success Systems allegedly "has reason to believe that Skupos and Excentus were sharing Success's proprietary processes to improve Skupos' offering, which is [allegedly] far inferior to that of Smokin' Rebates." *Id*. ¶ 50. Excentus terminated the agreement only after "Success [allegedly] had successfully certified the process, and Excentus and Skupos extracted all of Success's information, that Excentus terminated the agreement." *Id*.

Allegedly after Skupos and Excentus finalized their own agreement, "Excentus abruptly informed Success that it had no intention of living up to its agreement to integrate Smokin' Rebates with Fuel Rewards." *Id*. ¶ 51.

Then, Excentus allegedly "informed Johnson Oil that despite its agreement with Success, the only way it would be able to integrate tobacco rewards with Shell Fuel Rewards" was with Skupos, "Success' direct competitor[.]" *Id*. ¶ 52.

Success Systems allegedly "invested over four months . . . of time and effort in integrating and gaining certification of Smokin' Rebates into the Fuel Rewards program not only for the sixty-eight Johnson Oil locations, but to offer the newly integrated Smokin' Rebates program to all of the Shell Fuel Rewards location[s]." *Id*. ¶ 54. According to Success Systems, anything less than integrating with all Shell Fuel Rewards locations "would not justify the investment." *Id*.

Success Systems allegedly "proceeded with the understanding that" after spending time and effort on the Fuel Rewards/Smokin' Rebates integration, "Excentus would allow it to offer the program to other Shell Fuel Rewards locations." *Id*. ¶ 55.

Success Systems allegedly lost significant revenue from the inability to offer its program to other Shell Fuel Rewards locations. *Id*.

### 5.    The Alleged Antitrust Violations

As the sole provider of the Shell Fuel Rewards programs, Excentus allegedly "gathers all data relating to the sales of fuel and all products sold at Shell Fuel Rewards service stations, including tobacco products, and provides the same to Shell." *Id*. ¶ 57. Excentus then allegedly "is the custodian of 12% of all C-store sales data in the United States . . . and 100% of the sales data from the 12,000 Shell Oil stations that use Fuel Rewards." *Id*. ¶ 58. For Shell Oil service stations

to remain competitive they "must participate in a tobacco rewards program, [they] must arrange for a tobacco rewards provider—such as Success or Skupos—to receive the data collected by Excentus with respect to the sale of tobacco products and use said data to report sales to major tobacco manufacturers." *Id*. ¶ 59.

After allegedly "entering into this anticompetitve conspiracy and agreement with Skupos," Excentus allegedly notified Johnson Oil and other Fuel Rewards participants that, in order to implement a tobacco rewards program, they allegedly "would have to partner with Skupos and could not use Success' Smokin' Rebates, even though Smokin' Rebates had just [allegedly] successfully undergone a [four] month proofing test with Johnson Oil and was the only tobacco rewards program that actually worked with Fuel Rewards." *Id*. ¶ 62.

Success Systems allegedly has learned from other C-store owners "that Skupos is offering predatory and economically unjustified rates to Fuel Rewards customers" to persuade customers "who would rather use Smokin' Rewards or another provider" to instead use Skupos. *Id*. ¶ 63.

Success Systems alleges "that once it spent four months of time and effort integrating Smokin' Rewards, Excentus would allow it to offer the program to the other Shell Fuel Rewards locations." *Id*. ¶ 55. Success Systems allegedly has lost significant revenue "as a result of being prohibited from offering Smokin' Rebates to other Shell Fuel Rewards users . . . ." *Id*. Indeed, Success Systems allegedly "agreed to absorb the bulk of its development and implementation cost involved in the Shell Fuel Rewards/Smokin' Rebates integration with the understanding by both Johnson Oil and Excentus that said costs would be recouped through the long-term operation of Smokin' Rebates in the Shell Fuel Rewards network." *Id*. ¶ 56.

Excentus's effective monopoly on 12,000 Shell Oil locations means Excentus "effectively control[s] who can provide tobacco rewards regardless of which tobacco rewards provider the individual Shell Fuel Rewards location wants to use." *Id*. ¶ 60. By restricting the tobacco reward provider to Skupos, "Excentus and Skupos conspired to create a vertical monopoly by which Skupos would be the only provider of tobacco rewards programs to all 12,000 Fuel Rewards locations." *Id*. ¶ 61.

For a Shell C-store to remain competitive "it must participate in a tobacco rewards program" and must have a tobacco rewards provider, like Success Systems or Skupos, "receive the data collected by Excentus with respect to the sale and use said data to report sales to the major tobacco manufacturers." *Id*. ¶ 59.

Success Systems alleges that "both Excentus and Skupos . . . deliberately used Success's resources, reputation and cache with Altria and RJ Reynolds for an expedited certification, knowing that that certification would transferred to Skupos." *Id*. ¶ 64. Skupos, even now, allegedly "struggles with RJ Reynolds and ITG certifications, only having a small percentage of their customer base certified on those platforms." *Id*.

Skupos allegedly can implement "predatory and economically unjustifiable pricing as a means of pushing others out of the tobacco rebates market because it is backed by investors" who can absorb the short-term loss "in exchange for a monopoly wherein Skupos is the only viable player in the market and competitors like Success are squeezed out." *Id*. ¶ 65.

Excentus and Skupos allegedly "engage in unethical, unfair, and anticompetitive schemes and strategies in restraint of trade." *Id*. ¶ 66. This activity allegedly suppresses competition and prevents "Success from contracting with any of the 12,000 Shell Rewards locations." *Id*. ¶ 67. Furthermore, this activity allegedly raises "barriers to entry in the relevant Shell Fuel Rewards

tobacco rewards market" and ensures Skupos's establishment and perpetuation in the Shell Fuel Rewards market. *Id.* ¶ 68.

Success Systems further alleges that there is "no valid or legitimate business justification" for this anticompetitive and exclusionary conduct. *Id.* ¶ 69. It allegedly evinces a "specific intent to monopolize the Shell Fuel Rewards tobacco rewards market by eliminating, destroying, or foreclosing any meaningful competition[,]" then allowing "Excentus and Skupos to dictate the prices and the terms of the tobacco rewards" provided. *Id.* ¶ 70. Excentus and Skupos, through their allegedly "intentional, sweeping, and disruptive conduct . . . [are] willful, malicious, and oppressive." *Id.* ¶ 72.

### 6. The Alleged Relevant Market

Success Systems alleges that, for the purposes of its antitrust claims, the relevant product market "is the Shell Fuel Rewards tobacco rewards market[,]" allegedly unique, distinct, and not in competition with the broader general tobacco rewards market. *Id.* ¶¶ 73-74. Excentus "control[s] entry and access to the Shell Fuel Rewards market because it controls the data necessary to make a tobacco rewards program function as part of the Shell Rewards program." *Id.* ¶ 75. Excentus allegedly controls entry into the provider of the tobacco rewards program, *id.* ¶ 76, and, similarly, a Shell Fuel Rewards gas station or chain "must purchase a tobacco rewards provider who is part of the Shell Fuel Rewards tobacco rewards market[,]" *id.* ¶ 77. As a result, "tobacco rewards programs which are generally available to gas stations and C-stores cannot be included in the same relevant market," as these tobacco rewards programs are excluded from all Shell Fuel Rewards locations. *Id.* ¶ 78.

The relevant geographic market allegedly includes "the nationwide Shell Fuel Rewards tobacco rewards market and the world-wide tobacco rewards market." *Id.* ¶ 82.

The nature of the limited and controlled market allegedly results in considerable cost "for a Shell Fuel Rewards location to switch to another tobacco rewards provider . . . ." *Id.* ¶ 87. In order for a Shell Rewards user to employ "a tobacco rewards program not sanctioned by Excentus, it [allegedly] would likely have to quit the Shell Fuel Rewards network which would be expensive, administratively onerous, and extremely time consuming." *Id.* It allegedly "would be cumbersome, expensive, inefficient, and in all probability economically unfeasible" for any tobacco rewards provider to integrate without Excentus's systems and data. *Id.* ¶ 88.

Switching providers without Excentus's consent also allegedly "would entail a high information cost." *Id.* ¶ 91. The tobacco rewards programs "are often inherently confusing and opaque" and programs that work with the Excentus program without interfering "would necessarily be experimental, temperamental, and may end up costing more in the short run than a program run with Excentus' permission." *Id.* ¶ 92.

Because of Excentus's alleged market power, "locked-in Shell Fuel Rewards locations are either being exploited by Excentus and Skupos working in concert, or are [in] danger of such an exploitation." *Id.* ¶ 94. "[C]ompetition from the greater tobacco rewards market cannot control or prevent anticompetitive or exclusionary activity in the Shell Fuel Rewards tobacco market." *Id.* ¶ 96. Finally, within the Shell Fuel Rewards tobacco rewards market, allegedly "there is no significant elasticity of demand." *Id.* ¶ 99.

"Excentus and Skupos [allegedly] have market power in the Shell Fuel Rewards tobacco rewards market." *Id*. ¶ 100. Success Systems alleges Excentus has used "its market power to exclude Success and others from the relevant market and instead give its approval and cooperation [to] Skupos[.]" *Id*. ¶ 102. The alleged market power also allegedly means that Excentus and Skupos are "able to dictate fees and costs which are not competitive in the larger tobacco rewards market." *Id*. ¶ 103.

### B.    Procedural History

On March 27, 2019, Success Systems, Inc., and Smart C-Stores, LLC filed a Complaint against Excentus and Skupos. Compl., ECF No. 1 (Mar. 27, 2019).

On July 17, 2019, after Defendants submitted motions to dismiss for lack of personal jurisdiction and failure to state a claim, Plaintiffs filed an Amended Complaint. Am. Compl., ECF No. 58 (July 17, 2019).

On August 20, 2019, Excentus filed a motion to dismiss for failure to state a claim and, in the alternative, transfer under the first-filed rule. Mot., ECF No. 62 (Aug. 20, 2019) "Mot. to Dismiss Failure to State a Claim"). The filing included a memorandum of law, Excentus Mem., ECF No. 62-1 (Aug. 20, 2019) ("Excentus Failure to State a Claim Mem."), and accompanying exhibits, Exs. 1-9. ECF Nos. 2-10 (Aug. 20, 2019).

On August 20, 2019, Excentus also filed a motion to dismiss for lack of jurisdiction and improper venue. Mot., ECF No. 63 (Aug. 20, 2019) ("Mot. to Dismiss Personal Jur."). The filing included a memorandum of law, Excentus Mem., ECF No. 63-1 (Aug. 20, 2019) ("Excentus Jurisdiction Mem."), and accompanying exhibits, Exs. 1-7. ECF Nos. 2-8 (Aug. 20, 2019).

On September 12, 2019, Skupos submitted a motion to dismiss. Mot., ECF No. 69 (Sept. 12, 2019). The filing included a memorandum, Skupos Mem., ECF No.69-1 (Sept. 12, 2019) ("Skupos Mem."), and a declaration and accompanying exhibits, Exs., ECF No. 69-2 (Sept. 12, 2019).

On September 30, 2019, Plaintiffs timely filed oppositions to both of Excentus's motions to dismiss. *See* Mem. in Opp'n Failure to State a Claim, ECF No. 74 (Sept. 30, 2019) ("Pl. Opp'n Failure to State a Claim"); Mem. in Opp'n Jurisdiction and Venue, ECF No. 75 (Sept. 30, 2019) ("Pl. Opp'n Jurisdiction").

On October 15, 2019 Excentus filed two replies to Plaintiffs' opposition memoranda. *See* Reply, ECF No. 76 (Oct. 15, 2019) ("Excentus Reply Failure to State a Claim"); Reply, ECF No. 77 (Oct. 15, 2019) ("Excentus Reply Jurisdiction").

On October 21, 2019, Plaintiffs timely opposed Skupos's motion to dismiss. Opp'n Mem., ECF No. 78 (Oct. 21, 2019) ("Pl. Opp'n Skupos").

On November 11, 2019, Skupos timely submitted its reply to Plaintiffs' opposition. Reply, ECF No. 80 (Nov. 11, 2019) ("Skupos Reply").

On December 20, 2019, Excentus filed a notice of decision in a related case. Notice, ECF No. 82 (Dec. 20, 2019) ("Excentus Notice").

On December 28, 2019, Plaintiffs responded to the notice of decision in a related case. Notice, ECF No. 84 (Dec. 28, 2019) ("Pls.' Notice").

On January 14, 2020, the Court held a hearing on the outstanding motions. Minute Entry, ECF No. 88 (Jan. 14, 2020).

On January 24, 2020, Skupos filed a notice with the Court that the service agreement, although previously expired, had been extended. Notice, ECF No. 91 (Jan. 24, 2020).

On January 27, 2020, Success Systems filed a counter-notice, arguing that because the agreement between Defendants never actually lapsed, there is no reason to consider mootness. Counter-Notice, ECF No. 92 (Jan. 27, 2020).

## II.  STANDARD OF REVIEW

### A.  Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). The plaintiff therefore must make a prima facie showing that jurisdiction exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

"The prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.*; *see also Glenwood Sys., LLC v. Med-Pro Ideal Sols., Inc.*, No. 3:09-cv-956 (WWE), 2010 WL 11527383, at *2 (D. Conn. May 4, 2010) ("At this stage of the proceedings, if the court relies upon pleadings and affidavits, the plaintiff must make out only a prima facie showing of personal

jurisdiction, and the affidavits and pleadings should be construed most favorably to the plaintiff."), *aff'd*, 438 F. App'x 27 (2d Cir. 2011) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). A court considers the facts as they existed when the plaintiff filed the complaint. *See id.* (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991)).

A court must apply Connecticut's long-arm statute, which provides that "a trial court may exercise jurisdiction over a foreign defendant only if the defendant's intrastate activities meet the requirements both of [the state's long-arm] statute and of the due process clause of the federal constitution." *Thomason v. Chem. Bank*, 234 Conn. 281, 285-86 (1995). If the court has personal jurisdiction over the defendant under the long-arm statute, the court will consider whether jurisdiction would comport with the Due Process Clause of the United States Constitution. *See Licci ex rel. Licci v. Lebanese Canadian Bank*, 723 F.3d 161, 168 (2d Cir. 2013); *see also Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 190 Conn. 245, 250 (1983) (explaining that the court need only address due process considerations if it determines that jurisdiction exists under the long-arm statute).

### B. Rule 12(b)(3)

"In deciding a motion to dismiss based on improper venue, [t]he court must take all allegations in the complaint as true, unless contradicted by defendants' affidavits, and [w]hen an allegation is challenged [a] court may examine facts outside the complaint to determine whether venue is proper." *Quinn v. Fishkin*, No. 3:14-cv-1092 (AWT), 2015 WL 4635770, at *3 (D. Conn. Aug. 4, 2015) (internal quotation marks and citation omitted). "[T]he court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff, who has the burden of showing that venue in the forum is proper." *Id.* (internal quotation marks and citations

omitted). "If the venue is not proper, the district court 'shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.'" *Id.* (quoting 28 U.S.C. § 1406(a)). "Whether dismissal or transfer is appropriate lies within the sound discretion of the district court." *Minette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993).

### C. Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also views

the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

There are three motions before the Court: (1) a motion to dismiss for failure to state a claim and, in the alternative, transfer venue under the first-filed rule submitted by Excentus; (2) a motion to dismiss for lack of personal jurisdiction and improper venue submitted by Excentus; and (3) a motion to dismiss for failure to state a claim submitted by Skupos.

Although Excentus requests that the Court consider the motion to dismiss on the merits, the Court will first consider whether the Court has personal jurisdiction over the Plaintiffs' state law claims. Mot. to Dismiss Personal Jur. at i n.1 ("[T]he Court should consider Excentus Corporation's 12(b)(6) motion first in this case because Excentus' personal-jurisdiction and venue arguments turn, in part, on whether Plaintiffs adequately pled their claims."). Because the

Plaintiffs' Amended Complaints suggests diversity of citizenship between the parties, *see* Am. Compl., the Court may have jurisdiction over Plaintiffs' state law claims, even if the federal claims are dismissed. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) (A plaintiff invokes diversity of citizenship under 28 U.S.C. § 1332 "when she presents a claim between parties of diverse citizenship that exceeds the required jurisdictional amount, currently \$75,000." (citing 28 U.S.C. § 1332(a)). After considering the jurisdictional issue, the Court will determine if transfer of any state law claims brought against Excentus is appropriate. Next, the Court will examine the substantive claims brought against Excentus and Skupos, to the extent necessary.

If the federal claims are dismissed, and the Court does not otherwise have jurisdiction over any state law claim, the Court will decline to exercise supplemental jurisdiction.

## A. Personal Jurisdiction

Under Connecticut's long-arm statute, "a trial court may exercise jurisdiction over a foreign defendant only if the defendant's intrastate activities meet the requirements both of [the state's long-arm] statute and of the due process clause of the federal constitution." *Thomason*, 234 Conn. at 285-86. If a court has personal jurisdiction over the defendant under the long-arm statute, the court then will consider whether jurisdiction would comport with the Due Process Clause of the United States Constitution. *See Licci ex rel. Licci*, 723 F.3d at 168; *see also Lombard Bros., Inc.*, 190 Conn. at 250 (explaining that the court need only address due process considerations if it determines that jurisdiction exists under the long-arm statute).

Connecticut's long arm statute provides that a foreign corporation will be amenable to a suit in this state based on a cause of action arising out of: (1) a contract made or to be performed in Connecticut; (2) business solicited in the state; (3) the production, manufacture, or distribution of goods with the reasonable expectation that they will be used or consumed in the state; or (4)

tortious conduct in the state. Conn. Gen. Stat. § 33-929(f). It does not require "that a party transact business within the state to be subject to suit nor does it require a causal connection between the plaintiff's cause of action and the defendant's presence in the state." *Tomra of N. Am., Inc. v. Envtl. Prods. Corp.*, 4 F. Supp. 2d 90, 93 (D. Conn. 1998) (footnote omitted) (citing *Thomason*, 234 Conn. at 295-97, and *Lombard Bros., Inc.*, 190 Conn. at 253-54). The statute instead requires "a nexus between the cause of action alleged and the conduct of the defendant within the state." *Donner v. Knoa Corp.*, No. 3:01-cv-2171 (JCH), 2002 WL 31060366, at *3 (D. Conn. July 29, 2002).

A court considers several factors

> to determine whether a contract can serve as the basis for personal jurisdiction: (1) "whether the defendant entered into an ongoing contractual relationship with a Connecticut-based plaintiff; (2) whether the contract was negotiated in Connecticut; (3) whether, after executing a contract with the defendant, the defendant visited Connecticut to meet with the plaintiff or communicated with the plaintiff as part of the contractual relationship; and (4) whether the contract contains a Connecticut choice-of-law provision."

*Dunne v. Doyle*, No. 3:13-cv-1075 (VLB), 2014 WL 3735619, at *7 (D. Conn. July 28, 2014) (quoting *Nusbaum & Parrino, P.C. v. Collazo De Colon*, 618 F. Supp. 2d 156, 161 (D. Conn. 2009)).

Excentus argues that there are "no contacts with Connecticut giving rise to personal jurisdiction." Excentus Jurisdiction Mem. at 1. Excentus notes, however, that its memorandum only touches on Success Systems's state law claims, as the Clayton Act authorizes nationwide service for antitrust claims. *Id*. at 1 n.3. In Excentus's view, the Complaint barely mentions personal jurisdiction and makes little effort to connect the factual allegations to this Court's jurisdiction. *Id*. at 9.

Excentus points to Connecticut law which allows a Connecticut court to "exercise personal jurisdiction . . . only if Success can show execution or performance of a contract, or tortious conduct in Connecticut." *Id.* at 10 (citing Conn. Gen. Stat. § 33.929(f)). According to Excentus, no contract was executed or performed in Connecticut, *id.* at 10-11, and no tortious conduct occurred, *id.* at 12-13. For that reason, exercising personal jurisdiction, general or specific, would violate the Due Process Clause and would not "comport with notions of fair play and substantial justice." *Id.* 13-14.

Success Systems responds that Connecticut's long-arm statute permits jurisdiction over both its contract and tort claims. Pl. Opp'n Jurisdiction at 3-5. In its view, because Connecticut courts examine whether a contract was made within the state or to be performed within in the state, this Court has jurisdiction. *Id.* at 4. Success Systems points to the fact that Excentus, although in Texas, began the relationship by calling Success Systems in Connecticut, and Excentus also sent data into Connecticut. *Id.* at 5-6. Regarding Excentus' argument that the agreement was created in Texas because Excentus accepted it in Texas, Success Systems responds that this argument is "without support, as the agreement required performance by both parties and entailed no exchange of goods or services for money." *Id.* Moreover, the employees and officers of Success Systems capable of entering an agreement all live in Connecticut. *Id.* Finally, Success Systems argues that it did perform in Connecticut. *Id.* at 6. In its view, the tort claims create jurisdiction in Connecticut because "[f]alse representations emanating from out of state into Connecticut have consistently constituted tortious acts of conduct in Connecticut" for jurisdictional purposes and "Success has alleged numerous tortious acts in Connecticut." *Id.* at 6.

Success Systems also argues that because "the defendant corporation purposefully engaged in the transaction with the plaintiffs, which was to be performed, in part, in Connecticut

and that litigation has risen as a result of this transaction" the minimum contacts requirement under the Due Process Clause has been satisfied. *Id.* at 8-9. Success Systems argues that traditional notions of fair play and substantial justice would not be offended because Excentus is a larger company, better suited to "the burden of litigation in a foreign state[,]" whereas litigation in a foreign state for Success "would have dire financial implications for the company." *Id.* at 10. Connecticut also "has an interest in protecting its residents from tortious conduct" and "Success clearly has an interest in obtaining relief in Connecticut." *Id.*

In response, Excentus reiterates that any alleged contract was not made or performed in Connecticut. Excentus Reply Jurisdiction at 2. The scope of the alleged agreement, in which Excentus allegedly "agreed to integrate [its] entire Fuel Rewards Program with Success' Tobacco Program[,]" then limits conduct and communications that could support personal jurisdiction. *Id.* at 2. In its view, the relevant conduct and communications do not demonstrate the contract was made in Connecticut, nor is there evidence of performance because "Success simply has no evidence that Success or Excentus performed work or shared information related to any Excentus Fuel Rewards client other than Johnson Oil." *Id.* at 3-4. Excentus notes that Success Systems's response referred only to its misrepresentation-tort based claims and so "failed to meet its burden of establishing [personal jurisdiction] . . . as to its tortious-interference and CUTPA claims[,]" so those claims should be dismissed. *Id.* at 5.

Excentus further argues that no personal jurisdiction exists under the Due Process Clause. *Id.* In its view, Success Systems presents no "evidence that Excentus sought out or otherwise initiated any integration agreement[,]" Excentus' phone calls or emails are nothing "more than mere communications into Connecticut[,]" the communications pertained "only to work

requested by" Illinois company Johnson Oil, and "the mere existence of a contract is insufficient to confer personal jurisdiction" over Excentus. *Id*. at 6.

The Court agrees.

Under Conn. Gen. Stat. § 33-929(f), the Court must examine the elements of Plaintiff's cause of action and the totality of the Defendants' contacts with the forum to determine "whether the defendant could reasonably have anticipated being haled into court here." *Am. Wholesalers Underwriting, Ltd. v. Am. Wholesale Ins. Grp., Inc.*, 312 F. Supp. 2d 247, 253 (D. Conn. 2004) (quoting *Lombard Bros., Inc.*, 190 Conn. at 254-44)). Success Systems is a Connecticut corporation and Smart C-Stores is a Delaware corporation with its place of business in Connecticut. Am. Compl. ¶¶ 1-2. While both parties agree that no formal contract document was signed or agreed upon, Success Systems alleges that an agreement was reached, while Excentus vehemently denies this. The companies were all initially brought together to integrate Smokin' Rebates into sixty-eight Johnson Oil locations. Am. Compl. ¶¶ 20-23.

In support of its argument that an agreement had been reached with Excentus, Success Systems relies on e-mails relating to the integration and testing of the Johnson Oil sites. Am. Compl. ¶ 40(a)-(d). Success Systems argues that phone calls and e-mails directed into Connecticut from Texas created an oral contract and support its claims of personal jurisdiction through contract. Am. Compl. ¶¶ 22, 25, 34.

Success Systems, however, fails to plead specific factual allegations which support its assertion that an oral contract was created. It refers to the creation of an agreement with Excentus without describing the party discussing the details of the agreement (at either Excentus or Success Systems) or describing in more specific or concrete terms the nature and scope of the agreement. "Complete integration with all Excentus Fuel Rewards locations" is vague and

indefinite; this phrase describes neither specific performance requirements of either party nor a timeframe in which the contract would be completed. *See Weiss v. Smulders*, 313 Conn. 227, 233-35 (2014) (affirming the lower court's finding that defendant was not in breach of an oral contract after discussions of "working together as two separate companies" and the defendant's indications "that [both plaintiff and defendant] would merge their companies to form a new enterprise" if their current relationship proved successful and the execution of distributorship contract, when plaintiff spent time and money "on marketing and research" for the new company which never came to fruition); *Geary v. Wentworth Lab., Inc.*, 60 Conn. App. 622, 237 (2000) ("[A]n agreement must be definite and certain as to its terms and requirements . . . . So long as any essential matters are left open for further consideration, the contract is not complete." (citation omitted)).

Furthermore, Success Systems points to no specific conversation or date of a conversation which took place where a mutual understanding and mutual assent were reached. *See Dunne*, 2014 WL 3735619, at *18 (a binding and enforceable contract requires offer, acceptance, and a mutual understanding which "manifest[s] itself by a mutual assent between the parties" (quoting *Housing Auth. v. DeRoche*, 112 Conn. App. 335, 370 (Conn. App. Ct. 2009)); Am. Compl. ¶ 27 ("In short, given the words, emails, practice and conduct of the parties over the ensuing months is that of [sic] parties working in concert and pursuant to a meeting of the minds and an agreement."). While "there is no bright line rule describing the essential elements of any and all enforceable contracts, [w]hether a term is essential turns 'on the particular circumstances of each case.'" *111 Whitney Ave., Inc. v. Comm'n of Mental Retardation*, 70 Conn. App. 692, 701 (Conn. App. Ct. 2002) (quoting *Willow Funding Co., L.P. v. Grencom Assoc.*, 63 Conn. App. 832, 845 (Conn. App. Ct. 2001)).

To the extent that Success Systems relies on its partial performance, Success Systems makes no effort to distinguish the work performed to fulfill the terms of its contract with Johnson Oil from the alleged oral contract with Excentus. Instead, it relies on its partial performance. "The outer boundaries of what qualifies as a contemplated performance are broad . . . '*incidental* acts of performance of contracts in [Connecticut] would come within [Connecticut's] statute' when the defendant also has other significant contacts with" Connecticut. *Samelko v. Kingstone Ins. Co.*, 329 Conn. 249, 261 (2018) (emphais in original).

While "to be performed" incorporates contemplated work and does not require the work to have actually been performed, *id.* at 258, without more specific allegations as to work done specifically for Excentus, Success Systems's factual allegations of partial performance are too vague to support the existence of an oral contract or that partial performance was begun for an agreement with Excentus, *see Twombly*, 55 U.S. at 558 ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." (internal quotation marks and citation omitted)); *see also Weiss v. Smulders*, 313 Conn. 227, 235 n.4 (2014) (rejecting a breach of oral contract claim finding "that the plaintiffs failed to provide sufficient evidence to demonstrate that there was a meeting of the minds as to the clear and definite terms of the merging of the parties' companies").

It is also significant that a contract allegedly so important or so lucrative to Success System's business was not reduced to a written agreement, suggesting that there was not a meeting of the minds on the essential terms of the oral contract. *See 111 Whitney Ave.*, 70 Conn. App. at 701 (comparing the defendant's conduct in the action with the "defendant's undisputed practice of contracting with service providers . . . on the basis of formal requests for proposal"

and finding that provided "further support for the defendant's argument that the essential terms of the [] contracts were not finalized because they were never in a written agreement").

In *Samelko*, under Connecticut's long-arm statute, the court allowed a New York corporation to be haled into Connecticut court because the express terms of the insurance policy required payment for any accident in "any location within the coverage territory, which span[ned] the United States." 329 Conn. at 261. Here, the absence of a written, formal agreement specifying the terms of performance in Connecticut undercut the significance of whatever work Success Systems alleges was accomplished in Connecticut. *See id.* ("In other words, when the contract expressly contemplates providing a defense and indemnification in Connecticut, it anticipates a host of unavoidable performances in Connecticut.").

Success Systems's attempt to establish personal jurisdiction through tort also falls short. Conn. Gen. Stat. § 33-929(f)(4) allows a finding of personal jurisdiction "out of tortious conduct in [Connecticut], whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance." Connecticut courts have rejected the argument that "a tort 'should be deemed to have been committed in Connecticut' simply because 'the injury is felt in Connecticut.'" *Fleming v. HD Supply Waterworks, Ltd.*, No. 3:16-cv-2081 (AWT), 2018 WL 5993914, *3 (D. Conn. Oct. 15, 2018) (quoting *Am. Wholesalers Underwriting, Ltd.*, 312 F. Supp. 2d at 253)).

Plaintiffs rely on *Teleco Oilfield Servs., Inc. v. Skandia, Ins. Co., Ltd.*, for the proposition that emanations into Connecticut are sufficient to establish personal jurisdiction for tort. 656 F. Supp. 753 (D. Conn. 1987). But that case involved an insurance policy with agreed upon terms in place. *Id*. at 755. Personal jurisdiction there was based on (1) the terms of the policy which required payment in Connecticut (making a failure to pay to "occur" in Connecticut); (2) that

defendant's "communication of the legal basis for denial of coverage" would have been made into Connecticut; and (3) that "misrepresentations of coverage" also would have been made into Connecticut. *Id.* at 758. Again, as noted above, the existence of a written agreement—the underlying insurance policy—provided the basis for finding personal jurisdiction, something notably absent here.

Accordingly, Success Systems has not met its burden of establishing personal jurisdiction over Excentus.[1]

## B.  Improper Venue

28 U.S.C. § 1391 governs venue for all civil actions filed in federal courts. Under that statute, a civil action may be brought in the judicial district in which any defendant resides or is subject to the court's personal jurisdiction, or in the judicial district in which a substantial part of the events giving rise to the action occurred. 28 U.S.C. § 1391(b). "[V]enue is proper so long as the requirements of § 1391(b) are met . . . ." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). But "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

"Whether venue is 'wrong' . . . depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws[.]" *Atl. Marine*, 571 U.S. at 55. Whether venue is "wrong" therefore is "generally governed by 28 U.S.C. § 1391[.]" *Id.* After

---

[1] Because the Court does not have personal jurisdiction through Connecticut's long-arm statute, it need not analyze whether the long-arm statute comports with the Due Process Clause. *See Licci*, 732 F.3d at 168 ("If jurisdiction lies, we consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution.").

finding that venue is wrong, "[w]hether dismissal or transfer is appropriate lies within the discretion of the district court." *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993).

28 U.S.C. § 1391(b) provides:

> A civil action wherein jurisdiction is not found solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

Under Section 1391(b)(1), "a corporation is deemed to 'reside' in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." *Nelson v. Wells Fargo Bank, N.A.*, No. 17-cv-4045 (LAP), 2019 WL 2514229, at *7 (S.D.N.Y. June 18, 2019) (quoting *Bell v. Classic Auto Grp., Inc.*, No. 04 Civ. 0693 (PKC), 2005 WL 659196, at *4 (S.D.N.Y. Mar. 21, 2005)).

Section 1391(b)(2) requires a "substantial" part, construed strictly, of the events to have occurred in the district where venue is sought. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356 (2d Cir. 2005). "[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Id.* at 357 (emphasis in the original). For a plaintiff to defeat a venue challenge with § 1391(b)(2), the court must (1) "identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims" and (2) determine "whether 'significant events or omission to [those] claims . . . have occurred in the district in question.'" *NovaFund Advisors, LLC v. Capitala Grp., LLC.*, No. 3:18-cv-1023 (MPS), 2019 WL 1173019,

at *12 (D. Conn. Mar. 13, 2019) (alterations in the original) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 431 (2d Cir. 2005)).

Section 1391(b)(3) "indicates that venue may be on [this] subsection only if venue cannot be established in another district pursuant to any other venue provision." *Daniel*, 428 F.3d at 434; *see also Rose v. Myers*, No. 3:13-cv-419 (MPS), 2013 WL 6073627, at *1 (D. Conn. Nov. 18, 2013) (finding venue under § 1391(b)(3) improper where plaintiff did "not contend that there is no district in which [the] action may otherwise be brought").

Excentus argues that venue is improper for Success Systems's contract claim under Rule 12(b)(2). Specifically, the alleged contract "would have required nationwide performance from both parties," but this contract claim "hinges on whether Excentus' conduct gave rise to a contract." Excentus Jurisdiction Mem. at 20 (emphasis omitted). And had a contract been formed, breach could only have occurred in Dallas "because Dallas is where Excentus executives decided to do what Success complains about—(1) not partner with Success and (2) not provide Success with confidential Fuel Rewards Program data[.]" *Id*.

Excentus also argues that venue is improper for Success Systems's misrepresentation-based claims and tortious interference claims. The Amended Complaint refers to "decisions Excentus made in Texas and events that unfolded in Illinois," because Success Systems has not pled facts which indicate "Connecticut is a proper venue for its misrepresentation-based claims." *Id*. at 21. Success Systems' tortious-interference claims similarly lacks any factual allegations establishing "any legal connection to Connecticut." *Id*. at 21-22.

Success Systems responds that venue is proper because (1) "Excentus reached out to Success in Connecticut to initiate the integration of the systems" and (2) "all of the work Success performed in furtherance of the agreement between the parties was conducted in Connecticut."

Pl. Opp'n Jurisdiction at 13. Because these constitute a substantial part of the underlying events, Plaintiffs believe venue is proper in Connecticut. *Id.*

According to Excentus, "Success bears the burden of establishing that venue is proper" in Connecticut and has failed to do so. Excentus Reply Jurisdiction at 6.

The Court agrees.

Venue is improper under Section 1391(b)(1) because the Court lacked personal jurisdiction over either defendant at the start of this action, nor do any of the defendants reside in Connecticut. Plaintiff does not argue that there is no other venue in which this action can be brought, making Section 1391(b)(3) inapplicable.

Success Systems relies on 28 U.S.C. § 1391(b)(2) for proper venue. But Section 1391(b)(2) permits venue in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." While Success Systems describes Excentus reaching out into Connecticut to execute the agreement, the alleged communication relates to the execution of the agreement with Johnson Oil. Am. Compl. ¶ 40; *see also Gulf Ins. Co.*, 417 F.3d at 357 (cautioning district courts "to take seriously the adjective 'substantial'" and "to construe the venue statute strictly"). The "substantial part" of performance determination for venue does not mirror the minimum contacts test employed in determining personal jurisdiction. *Gulf Ins. Co.*, 417 F.3d at 357 (citing *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003)). Furthermore, to the extent that omissions or misrepresentations occurred over the phone by Excentus executives, those omissions or misrepresentations would have occurred in Texas and any breach of an oral contract also would have occurred in Texas.

While Success Systems focuses its argument on the propriety of venue based on its contract claims, relying on the fact that "Excentus reached out to Success in Connecticut to

initiate the integration of the systems" and that "Excentus sent data and confidential and proprietary information" to Connecticut, Pl. Opp'n Jurisdiction at 12-13, Plaintiffs fail to establish a prima facie showing of venue under either their contract, tort, or misrepresentation claims, *see MAK Marketing, Inc. v. Kalapos*, 620 F. Supp. 2d 295, 310 (D. Conn. 2009) (In a 28 U.S.C. § 1404(a) venue inquiry, "misrepresentations and omissions are deemed to occur in the district where they are transmitted or withheld, not where they are received." (internal quotation marks omitted) (quoting *In re Nematron Corp. Secs. Litig.*, 30 F. Supp. 2d 397, 404 (S.D.N.Y. 1998))); *Alzal Corp. v. Emporio Motor Grp., L.L.C.*, No. 13 Civ. 2636 (LTS), 2013 WL 3866633, at *3 (S.D.N.Y. July 26, 2013) (finding venue improper for a tortious interference claim where a plaintiff did not proffer "sufficient facts to show its tort claim is substantially related to any acts that occurred in New York").

The Court thus dismisses the state law claims against Excentus without prejudice to renewal in the proper venue. *See Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993) ("Whether dismissal or transfer is appropriate lies within the sound discretion of the district court.").

### C. The Clayton Act Claims[2]

Section 3 of the Clayton Act prohibits:

> [A]ny person engaged in commerce . . . to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities . . . for use, consumption, or resale within the United States . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

---

[2] Because Excentus and Skupos have amended and extended the terms of the underlying agreement, the Court will not consider whether Success Systems's Clayton Act and Sherman Act claims against these defendants are moot. *See* Notice, ECF No. 91 (Jan. 24, 2020).

condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

This section of the Clayton Act applies to exclusive-dealing contracts, but "two prerequisites must be met: the exclusive dealing arrangement must be one for goods or other commodities, as opposed to services, and the agreement putting in place the arrangement must be a lease, sale or contract for sale." *Maxon Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL 4988268, at *6 (S.D.N.Y. Sept. 29, 2014). Section 3 does not apply to sales of services. *Id.* (citing *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., Inc.*, 510 F.2d 1140, 1145 (2d Cir. 1975)); *see also Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (a combination tangible sales of product and services contract is covered by the Clayton Act "if its 'dominant nature' or purpose is the sale of tangible products rather than the transfer of intangible rights or services").

Success Systems alleges violations under the Clayton Act against both Excentus and Skupos for conspiracy to restrain trade and exclusive dealing.

The Court addresses the claim against each defendant in turn.

### 1. Excetus

Excentus argues that the Clayton Act covers goods, supplies, and commodities and because "Success mentions no commodity offered for sale or lease by Excentus" the claim should be dismissed. Excentus Mem. to Dismiss Failure to State Claim at 30.

Success Systems does not respond to this argument in its opposition memorandum. Pl. Opp'n Excentus Failure to State a Claim.

In its reply, Excentus notes Success Systems's failure to "allege a sale of lease or commodities" and Success Systems's opposition "in no way attempts to address or cure its claims' deficiency because the deficiency is incurable." Excentus Reply Failure to State a Claim at 6.

The Court agrees.

Success Systems's claims revolve around a contract to gather, collect, and report data from convenience stores attached to gas stations. Success Systems, however, has failed to allege in its Complaint or its memorandum in opposition how the antitrust violations it complains of relate to goods or commodities.

Accordingly, Success Systems' Clayton Act claim against Excentus will be dismissed.

## 2. Skupos

Skupos likewise argues that Section 3 of the Clayton Act applies only to tangible goods. Skupos Mem. at 7. Because nothing in Plaintiffs' Complaint "alleged 'Shell Fuel Rewards tobacco rewards market' bears any resemblance to a tangible good" the claims should be dismissed. *Id*. at 8.

Again, Success Systems does not respond to this argument. Pl. Opp'n Skupos.

In its reply, Skupos contends "Plaintiffs have abandoned their Clayton Act allegations entirely, having made no attempt to address Skupos' arguments that the Clayton Act does not apply, and having scarcely mentioned the Clayton Act at all." Skupos Reply at 2.

As discussed above with respect to Success' claim against Excentus, Success Systems similarly fails to allege a plausible Clayton Act claim against Skupos.

Accordingly, Success' Clayton Act claim against Skupos will be dismissed.

**D. The Sherman Act Claims**

The remaining claims all relate to Sections 1 and 2 of the Sherman Act. Under Section 1 of the Sherman Act, Success Systems alleges a conspiracy to restrain trade in the tobacco rewards market against both Excentus and Skupos. Under both Sections 1 and 2 of the Sherman Act combined, Success Systems alleges exclusive dealing in the tobacco rewards market against both Excentus and Skupos. Finally, under Section 2 of the Sherman Act alone, Success Systems alleges monopolization of the tobacco rewards market against Skupos only.

The Court will address each of these claims in turn.

**1. The Sherman Act § 1 Claims**

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in the restraint of trade and commerce . . . ." 15 U.S.C. § 1. Necessary to a Section 1 violation is the establishment of "a combination or some form of concerted action between at least two legally distinct economic entities." *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). "'In restraint of trade' has been read by the Supreme Court to be limited to 'unreasonable restraints' that are prohibited." *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 54 (2d Cir. 2019) (citing *State Oil Co. v. Khan*, 552 U.S. 3, 10 (1997)).

*Per se* unreasonable restraints "include mostly prominently 'horizontal' agreements among competitors to fix prices for their goods or services.'" *Id*. at 54-55. "Restraints that are not unreasonable *per se* are judged under the [fact-specific] 'rule of reason.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("*Amex II*"). The rule of reason attempts "to 'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and

restraints stimulating competition that are in the consumer's best interest.'" *Id.* (alterations in the original) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887, 886 (2007)).

"[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If the plaintiff establishes a restraint, "then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If the defendant establishes a procompetitive rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could reasonably be achieved through less anticompetitive means." *Id.* Anticompetitive effects may be proven directly or indirectly; "[i]ndirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Defining the relevant market and consumers in the relevant market occurs during the first step. *U.S. Airways*, 938 F.3d at 55; *see also Amex II*, 138 S. Ct. at 2285 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market."). "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered[,]'" *PepsiCo, Inc. v. Coca-Cola, Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)), or an "arena within which significant substitution in consumption or production occurs," *Amex II*, 138 S. Ct. at 2285 (citation omitted). Within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). "The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

Exclusive dealings arrangements or contracts can satisfy a plaintiff's initial burden of proof demonstrating coordinated action. *Geneva Pharm.*, 386 F.3d at 508. "Exclusive dealing arrangements implicate Section 1 because they have the potential unreasonably to exclude competitors or new entrants from a needed supply, or to allow one supplier to deprive other suppliers of a market for their goods." *Id.* (citing *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). "Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." *Jefferson Par.*, 466 U.S. at 45.

Proof of market power is not a requirement in all Section 1 cases. *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995). "If a plaintiff can show an actual adverse effect on competition," demonstrating market power is not required. *Id.* "'[W]here the plaintiff is unable to demonstrate such actual effects' . . . 'it must at least establish that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide." *Id.*

Market power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharm.*, 386 F.3d at 500. "One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of the market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2002). It also "may be shown by evidence of 'specific conduct indicating the defendant's power to control prices or exclude competition." *K.M.B. Warehouse*, 61 F.3d at 129. It is typically a fact-intensive inquiry. *Id.* at 199-200.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325. Interchangeability means roughly equivalent products exist, even if a consumer might have a preference between products the consumer could use either product and it would work effectively. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430, 436 (3d Cir. 1997); *see also E.I. Du Pont De Nemours*, 351 U.S. at 395 ("commodities reasonably interchangeable by consumers for the same purposes"). "Cross-elasticity of demand exists if consumers would respond to a light increase in the price of one product by switching to another product.'" *Todd*, 275 F.3d at 201-02 (quoting *AD/SAT v. Assoc. Press*, 181 F. S3d 216, 227 (2d Cir. 1999)). "'[A] single brand of a product or service" may "be a relevant market under the Sherman Act" if no substitute exists for the brand's products or services." *U.S. Airways*, 938 at 66 (quoting *Kodak*, 504 U.S. at 482).

### 2. The Sherman Act § 1 Conspiracy to Restrain Trace Claim Against Excentus

Excentus begins its argument discussing the potential relevant market. According to Excentus, "Success pleads no facts indicating that tobacco-loyalty programs provided to Shell gas stations are different from tobacco loyalty programs provided to other brands of gas stations." Excentus Mem. to Dismiss Failure to State a Claim at 23. The relevant question is "whether convenience stores in general might use tobacco-loyalty programs interchangeably." *Id.* at 24. With regards to Section 1 specifically, Excentus argues that "Section 1 of the Sherman Act require[s] a plaintiff to show that the defendant has market power in the relevant market" and Success Systems has pled "that Excentus owns only 12% of the market." *Id.* at 26. A 12% market share is insufficient to create an alleged harm to competition, considering "the Supreme Court has held that a 30% market share" is insufficient to allege the same kind of harm to

competition. *Id*. In Excentus's view, "Success has not and cannot plausibly allege that Excentus controls prices for tobacco-loyalty programs in general because Excentus has no control over non-Shell gas stations." *Id.* The small percentage of the relevant market and the inability to control prices indicates Excentus does not control "enough of a relevant market for it to have monopoly power." *Id*. at 27.

Additionally, in Excentus's view, Success Systems fails to plead an antitrust injury. *Id*. at 28. "[T]he only injury Success claims to have suffered in that market is losing the competition for a contract with Excentus." *Id*. at 29. This is a loss "from competition[, it] is not an antitrust injury[,]" *id*. at 29, nor is it the "kind of injury Congress enacted the antitrust laws to prevent[,]" *id.* at 28.

Success Systems responds by arguing that "[t]he relevant market refers to the relevant product market and the relevant geographic market" and often requires a fact-intensive inquiry. *Id*. at 22 (citing *PepsiCo, Inc.*, 315 F.3d at 105). At the motion to dismiss stage, Success Systems argues that it need only plead a market that is plausible and rational. *Id*. In its view, part of the relevant market inquiry examines the interchangeability and cross-elasticity which Success Systems has adequately pled. *Id*. at 22-23. According to Success Systems, because it "has alleged a relevant market of Shell Fuel Rewards tobacco rewards market" and that "Excentus and Skupos control 100% of this market[,]" Success Systems has adequately pled Excentus's and Skupos's market control to survive a motion to dismiss. *Id.* at 29.

To the extent Excentus argues Success Systems' claim "must fail because it has [plead] a single-brand market[,]" Success Systems responds that a single brand markets can exist "when other branded products may not be reasonably interchangeable[,]" *id*. at 24 (citing *Eastman*

*Kodak Co. v. Image Tech Serv., Inc.*, 504 U.S. 451 (1992)), and that it has sufficiently alleged the *Kodak* factors, *id.* at 25.

Finally, Success Systems argues that it "has alleged full exclusion from the stated relevant market by Excentus and Skupos and has therefore alleged a valid antitrust injury." *Id*. at 31.

Excentus replies that Success System's relevant market claims do not fit into the single brand market, nor has it alleged facts remotely similar to *Kodak*, and again relies on the actual agreement between Excentus and Skupos. Excentus Reply Failure to State a Claim at 6-8.

The Court agrees.

Even if "the [allegedly] exclusive dealing arrangement itself satisfies the § 1 requirement of coordinated action[,]" *Geneva Pharm.*, 386 F.3d at 508, Success Systems fails "to show how defendants' activities comprised an unreasonable restraint of trade[,]" *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998), and fails to adequately allege a relevant market.[3]

The rule of reason requires a demonstration of both a relevant market and an unreasonable restraint on trade. *Id*. Success Systems fails on both elements. Success Systems vaguely refers to the "effects on competition" produced by the arrangement between Skupos and Excentus. *See* Am. Compl. ¶¶ 67, 70, 79, 96, 114, 133. Success Systems discussed Excentus' "high market share and the competitive advantages that could have resulted in *potentially* higher prices, but significantly did not allege that prices were *actually* higher" because of the agreement. *Tops*, 142 F.3d at 96 (emphasis in original). "The fact that the defendant's actions

---

[3] Excentus also argues that it lacks monopoly power in defense of Success Systems's Sherman Act § 1 claim. *See* Excentus Mem. to Dismiss Failure to State a Claim at 26-27. This argument will be more fully addressed in the Court's analysis of any alleged monopoly power by Excentus with respect to Success System's § 2 claims.

prevent a plaintiff from competing in a market is not enough, standing alone, to satisfy [the] initial burden of proof." *Virgin Atl. Airways, Ltd. v. British Airways PLC*, 247 F.3d 256, 264 (2d Cir. 2001). Courts look to factors "like reduced output, increased prices and decreased quality" to determine "whether an actual effect has occurred . . . ." *Id.*

Success Systems, however, merely alleges that Skupos "provides services at a quality and rate out of step with the broader tobacco rewards market and has the ability to dictate rates without the influence of the broader market." Am. Compl. ¶ 112. It offers only slightly more detailed explanations as to quality. Success Systems mentions, again imprecisely, the alleged impact on price. *See* Am. Compl. ¶¶ 114 (Excentus and Skupos "have driven prices and fees out of step with the broader market"); 70 (Excentus and Skupos can "dictate the prices and the terms of the tobacco rewards services provided to the Shell Rewards locations"); 99 (if Excentus and Skupos raise prices "there will be no increased demand for tobacco rewards programs in the general market because the tobacco rewards providers in the general market are barred from participating in the Shell Fuel Rewards tobacco rewards market"). As discussed further below, none of these factual allegations support an actual adverse effect on competition and suggest that Success Systems complains of injury as a competitor and incorrectly defines the relevant market.

Success Systems distinguishes between the general tobacco rewards market and the Shell Fuel Rewards tobacco market in that "Excentus controls entry and access to the Shell Fuel Rewards market because it controls the data necessary to make a tobacco rewards program function as part of the Shell Rewards program." Am. Compl. ¶ 75. In its view, the market is separate and distinct from tobacco rewards programs generally available to gas stations and C-stores because other tobacco rewards programs are not available to Shell Fuel Rewards locations "and the providers of these other tobacco rewards programs cannot offer these programs to Shell

Fuel Rewards locations." *Id.*at 78. "[D]emand and competition in the general tobacco rewards markets will not affect the prices charged or the prices paid for tobacco rewards services in the Shell Fuel Rewards tobacco rewards market." *Id.* ¶ 79. And Success alleges that "there is no significant elasticity of demand[,]" increased prices from Excentus and Skupos would not affect the general market "because the tobacco rewards providers in the general market are barred from participating in the Shell Fuel Rewards tobacco rewards market." Am. Compl. ¶ 99.

But Success Systems fails to make any plausible allegations on the critical issue of interchangeability.

While defining a relevant market is a fact intensive inquiry, if a

> plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza*, 124 F.3d at 436). "The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" *Queen City Pizza*, 124 F.3d at 438 (quoting *E.I. du Pont de Nemours*, 351 U.S. at 295)). Any "restriction of intrabrand competition must be balanced against any increases in Interbrand competition" because the analysis considers "the relevant market as a whole[.]" *K.M.B. Warehouse*, 61 F.3d at 128. Success Systems fails to demonstrate how the Shell Fuel Rewards tobacco rewards market is different from the larger market for tobacco rewards generally and should be considered a separate and distinct market. *Cf. Chapman*, 546 F.3d at 238 (finding plaintiffs failed to define a relevant market where plaintiffs "failed to show

the market for restraint training services to *child care providers* is any different from the larger market for restraint training services to other businesses, agencies, and organizations" (emphasis in original)).

Success Systems thus alleges harm to a competitor in a market that has interchangeable suppliers (tobacco rewards programs) and interchangeable buyers (c-stores, gas stations, supermarkets). *See Queen City Pizza*, 124 F.3d at 438 ("[T]he dough, tomato sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies . . . Thus, the relevant market . . . cannot be restricted solely to those products currently approved by Domino's Pizza, Inc. for use by Domino's franchisees."); *Cf. K.M.B. Warehouse*, 61 F.3d at 127-28 ("Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product.").

Moreover, "[m]arket power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Eastman Kodak*, 504 U.S. at 462 (citations omitted). "One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of the market." *Todd*, 275 F.3d at 199. While Success Systems rightly alleges that Excentus has 100% of the market share of the Shell Fuel Rewards market, Success Systems fails to allege Excentus's market power over the properly defined relevant market, encompassing more than just the Shell Fuel Rewards program and including the entire market of convenience, grocery, liquor, tobacco and gasoline service stations. Success Systems thus has not adequately pled Excentus's market power.

Success Systems argues that the Shell Fuel Rewards market is a single-brand market, but Success Systems's argument fares no better under a single-brand market analysis.

Courts rely on the *Kodak* factors to determine if a single brand market is appropriate. The first *Kodak* factor is the "high switching costs faced by a substantial number of customers[.]" *Lima LS PLC v. PHL Variable Ins. Co.*, No. 3:12-CV-1122 (WWE), 2013 WL 3327037, at *5 (D. Conn. July 1, 2013) (citing *Commercial Data Servers, Inc. v. In'tl Business Mach. Corp.*, 262 F. Supp. 2d 50, 71 (S.D.N.Y. 2003)). The second *Kodak* factor requires a plaintiff to plead the "high information costs faced by a substantial number of customers[.]" *Lima*, 2013 WL 3327037 at *5. The third *Kodak* factor examines the "exploitation of the 'locked-in' customers." *Lima*, 2013 WL 3327037 at *5.

As to these factors, Success Systems first alleges that "switching to an un-sanctioned company would entail a high information cost" at Shell Fuel Rewards locations. In its view, Excentus has created considerable barriers such that if a user wanted to switch "it would likely have to quit the Shell Fuel Rewards network which would be expensive, administratively onerous, and extremely time consuming." Am. Compl. ¶ 91, 95. Success Systems then alleges that administering or switching to an unsanctioned tobacco rewards program "would entail a high information cost." Am. Compl. ¶ 91. Success Systems alleges that the "inherently confusing and opaque" nature of tobacco rewards programs and "a program that would work on top of and in conjunction with the Excentus program without interfering with the same would necessarily be experimental, temperamental, and may end up costing more in the short run than a program run with Excentus' permission." Am. Compl. ¶ 92. Finally, Success Systems alleges that "the market power of Excentus" has "locked-in Shell Fuel Rewards locations" and are exploited by

Excentus and Skupos. Am. Compl. ¶ 94. Success Systems refers back to high switching costs and high information costs in supporting its claim that customers are "locked-in." *Id.* ¶ 97.

But the Shell Fuel Rewards Program is not a single-brand market. Unlike *Kodak*, which dealt with "market power in the primary market" which precluded "the possibility of market power in derivative aftermarkets[,]" no such aftermarket exists here. *Eastman Kodak*, 504 U.S. at 454-55. Excentus correctly notes that the relevant inquiry is "whether convenience stores in general might use tobacco-loyalty programs interchangeably." Excentus Mem. Failure to State a Claim at 24.

Because the tobacco rewards programs are interchangeable, the relevant market cannot plausibly be limited to Shell gas stations participating in the Shell Fuel Rewards program, and must include all convenience stores, grocery stores, liquor stores, tobacco stores and gasoline service stations capable of using tobacco rewards programs. Success Systems thus has failed to plausible allege its Sherman Act § 1 claim against Excentus. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement . . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555-57); *Twombly*, 550 U.S. at 558 ("So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." (internal quotation marks and citation omitted)).

Accordingly, Success' claim of unreasonable restraint of trade against Excentus will be dismissed.[4]

---

[4] The Court further considers whether Success Systems has sufficiently pled an antitrust injury below in the context of Success Systems's exclusive dealing claim against Excentus.

## 2. The Sherman Act § 1 Conspiracy to Restrain Trace Claim Against Skupos

As for Success Systems' Section 1 claims, Skupos argues that Success Systems fails to define any relevant market, which "requires identifying both the relevant product market as well as the relevant geographic market." Skupos Mem. at 11 (citation omitted). "[T]he fact that gas stations and convenience stores that choose to align themselves with the Shell Fuel line must operate under the Fuel rewards program . . . and must then operate under Excentus' terms is irrelevant to defining a relevant market." *Id.* at 14. Skupos further argues that Success Systems fails to "plead facts to support [the] narrow theory" of a single-brand market, supported by alleged "lock-in" factors. *Id*. The Amended Complaint "attempts to define a product market that fits Plaintiffs' personal injury as opposed to a relevant market that meets antitrust pleading standards . . . ." *Id.* at 17 (emphasis omitted).

Skupos argues that Success Systems fails to plead harm to competition, as required to establish an antitrust injury. *Id.* at 8-9. In its view, Success Systems pleads factual allegations that "relate to potential harm to themselves in the particular rewards programs implemented in the Shell stations for which Excentus offers a fuel rewards program." *Id.* Skupos characterizes Success Systems's injury as harm from competition and not to competition generally. *Id.*

Success Systems again argues that defining a relevant market is a fact-intensive injury, unsuitable at this stage of litigation. Pls.' Opp'n Skupos at 6. Success Systems contends that it has alleged "(a) how Shell Fuel Rewards members face high costs to leave the Excentus/SkuPos monopoly on tobacco rewards program . . . (b) the opacity of the tobacco rewards pricing and discount scheme and the overall difficulty in ascertaining relevant information, and (c) the exploitation and potential exploitation" of customers locked into the Skupos tobacco rewards program. *Id.* at 9-10.

Success Systems also states it has alleged a valid antitrust injury by pleading its "full exclusion from the relevant market by Excentus and Skupos.[,]" *id.* at 16, and notes it has pled conspiracy and notes Skupos relies on summary judgment case law, *id.* at 18.

Skupos replies that Success Systems attempts "to define the relevant market as 'Shell Fuel Rewards tobacco rewards market' without factual allegations regarding reasonable interchangeability and cross-elasticity of demand." Skupos Reply at 2. Success Systems's attempt to create a "lock-in theory" market fails because they "do no more than speculate and offer legal conclusions." *Id.* at 4. In its view, Skupos "cannot rely on their conclusory allegations of information and switching costs alone, and there is no question of fact about cross-elasticity." *Id.*

Skupos thus reiterates its arguments that Success Systems has failed to allege an antitrust injury. *Id.* at 6-7.

The Court agrees.

For the same reasons that Success Systems's restraint of trade claim under § 1 of the Sherman Act fails against Excentus, Success Systems also fails to allege plausibly a viable unreasonable restraint of trade claim under § 1 of the Sherman Act against Skupos.

Accordingly, Success Systems's unreasonable restraint of trade claim under § 1 of the Sherman Act against Skupos will be dismissed.

### 3. The Sherman Act § 1 and §2 Exclusive Dealing Claims

"An exclusive dealing agreement is 'a contract between a [supplier] and a buyer that forbids the buyer from purchasing the contracted [service] from any other seller." *Conn.Ironworkers Employers' Ass'n v. New England Regional Council of Carpenters*, 324 F. Supp. 3d 293, 306 (D. Conn. 2018) (citations omitted). It is not a *per se* violation of antitrust law,

unlike group boycott. *Id.* Exclusive dealing contracts are analyzed under the same rule of reason.

*Id.* (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir.

2000)). Because exclusive dealing arrangements can have pro-competitive purposes and effects,

"courts must take care to consider the competitive characteristics of the relevant market."

*Geneva Pharm.*, 386 F.3d at 508. Not all injuries constitute an antitrust injury, "[f]or instance, an

'exclusive-dealing partner whose business relationship was terminated in favor of another

exclusive-dealing partner' is '[c]learly not a victim of antitrust injury." *Conn. Ironworkers*, 324

F. Supp. 3d at 306 (citation omitted); *see also Geneva Pharm.*, 386 F.3d at 508 ("Exclusive

dealing is an unreasonable restraint of trade and a § 1 violation only when the agreement freezes

out a significant fraction of buyers or sellers from the market.").

Success Systems alleges that the exclusive agreement entered into by Excentus and

Skupos regarding the Shell Fuel Rewards program violates both Sections 1 and 2 of the Sherman

Act. Excentus and Skupos argue that the alleged exclusive agreement was, in fact, non-exclusive.

The Court will address each of these claims in turn. [5]

### i. The Exclusive Dealing Claim Against Excentus

Excentus again argues Success Systems has failed to plead any plausible antitrust

violations. Excentus Mem. Failure to State a Claim at 22. It includes the agreement with Skupos

"which explicitly states that [the agreement] is not exclusive." *Id.*; Ex. 3 – Skupos Agreement,

ECF No. 62-4 at 2 (Aug. 20, 2019). In its view, Success Systems fails to plead a relevant market,

---

[5] Significantly, the Court has not identified any caselaw – nor have Success Systems identified any caselaw in its filings suggesting the proper standard of review for this allegedly hybrid § 1 and § 2 of the Sherman Act claim. *See* 15 U.S.C §§ 1-3 (specifying distinct elements for each individual antitrust claim). Consistent with other exclusive dealing claims, however, the Court will analyze this claim using caselaw applying § 1 of the Sherman Act. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); (analyzing a challenged restraint of trade, which was not per se illegal, under the rule of reason). At best, one treatise suggests "exclusive dealing is subject to challenge under Section 1 of the Sherman Act . . . and as conduct evidencing a violation of Section 2 of the Sherman Act." ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS, 215 (Debra J. Peralstein et al. eds., 5th ed. 2002).

instead limiting the market to the tobacco-loyalty programs only at Shell gas stations. *Id*. at 23. And Success Systems fails to allege that a relevant market exists based on "lock-in factors." *Id*. at 25. According to Excentus, "[t]he 'high switching costs, the lack of information and high information costs, and the exploitation of the locked-in customer' . . . [does] not transform the market for tobacco loyalty programs at Shell gas stations into a relevant market." *Id*.

Success Systems responds that the "realities of the relationship between [Excentus] and Skupos is a question of fact" that must ultimately be determined by a trier of fact. Pl. Opp'n Excentus Failure to State a Claim at 21. Success Systems further argues that it has alleged the market and monopoly power of Excentus in a relevant market, the Shell Fuel Rewards tobacco rewards market. *Id*. at 28-29. In it view, Success Systems has alleged, and Excentus does not contest, "that Excentus and Skupos control 100% of this market." *Id*. at 29. "The exclusive conduct of Defendants in creating a monopoly in, and excluding Success from the relevant market is clearly illegal and anticompetitive." *Id*. at 32.

The Court disagrees.

Success Systems's anticompetitive arguments must be considered in this context: they were contemplating forming the same agreement with Excentus that Skupos ultimately formed. *See* Am. Compl. ¶ 37 (Success's marketing the integration of Smokin' Rebates with Shell Fuel Rewards and Excentus's lack of an objection to the ads "is further evidence of the agreement to make Smokin Rewards available to all Fuel Rewards locations after the work to integrate the platforms was complete.").

In any event, as discussed above, Success Systems has failed to allege a plausible claim for exclusive dealing because Success Systems fails to allege a relevant market or the antitrust injury felt within that market. *See Tampa Elec. Co. v. Nashville Coal, Co.*, 365 U.S. 320, 327

(1961) ("[E]ven though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."). Indeed, Success Systems's allegations of injury to competition are vague and conclusory. Am. Compl. ¶¶ 67, 70, 114. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (citing *Twombley*, 550 U.S. at 556)).

Accordingly, Success Systems' exclusive dealing claim against Excentus will be dismissed.

## ii. The Exclusive Dealing Claim Against Skupos

Skupos also argues that Success Systems only repeatedly uses the word "conspiracy" without providing accompanying factual allegations, Skupos Mem. at 22, and again relies on the non-exclusive agreement between Skupos and Excentus to claim exclusive dealing between the two, *id.* at 24. In its view, Success Systems presents "no allegations as to how the alleged (but nonexistent) exclusive agreement between Skupos and Excentus . . . unreasonably restrains trade (as opposed to simply Plaintiffs)." Skupos Mem. at 26.

Success Systems again argues it has adequately alleged its Sherman Act claims. Pl. Opp'n Skupos at 16. In its view, the written agreement between Excentus and Skupos "does not prohibit Excentus from dealing exclusively with Skupos, it only states that Exentus is not required to deal exclusively with Skupos." *Id.* at 17. And the parties' behavior suggest exclusive dealings: (1) "after Excentus and Skupos finalized their agreement Excentus pulled the plug on the ongoing integration, 2) Excentus told Johnson Oil it had to continue the integration with Skupos instead, and 3) Excentus stated in a phone call that the reason it was terminating the agreement with Success was that it had entered into an exclusive relationship with Skupos." *Id.*

at 17 (citations omitted). In its view, Success Systems has pled a relevant market, which Excentus and Skupos monopolize, and which Success Systems is excluded from because of their "clearly illegal and anticompetitive conduct." *Id.* at 17-18.

The Court disagrees.

As discussed above, Success Systems has failed to plausibly plead a relevant market or that an exclusive agreement exists, dooming the exclusive agreement claim against Skupos, just as the absence of these allegations, doomed this claim against Excentus.

Accordingly, Success Systems's exclusive dealing claim against Skupos will be dismissed.

### 4. The Sherman Act § 2 Claim

Section 2 of the Sherman Act requires a plaintiff to "establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc.*, 315 F.3d at 105 (quoting *United States v. Grinnell Corp.*, 384 U.S. 562, 570-71 (1966)). "[E]valuating market power begins with defining the relevant market." *Geneva Pharm.*, 386 F.3d at 496. Market power is "[t]he core element of a monopolization claim." *Id.* (citation omitted).

"Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992). Alternatively, "the ability of a single seller to raise price and restrict output.'" *Id.* (citations omitted). To determine if monopoly is probable, "a court must inquire 'into the relevant product and geographic market and the defendant's economic power in that market.'" *Queen City Pizza*, 124 F.3d at 442 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447,

459 (1993)). A court gauges interchangeability based on factors like "price, use, and qualities" or "by 'cross elasticity of demand between the product itself and substitutes for it.'" *Id*. at 437. "Cross-elasticity of demand exists if consumers would respond to a light increase in the price of one product by switching to another product.'" *Todd*, 275 F.3d at 201-02.

"To have standing to prosecute private antitrust claims, plaintiffs must show more than that the defendants' conduct caused them an injury." *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). The injury alleged "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id*. (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "[I]njuries resulting from competition alone are not sufficient to constitute antitrust injuries." *Id*. "[A]n 'exclusive-dealing partner whose business relationship was terminated in favor of another exclusive-dealing partner' is '[c]learly not a victim of antitrust injury.'" *Conn. Ironworkers Emp'rs. Ass'n v. New Eng. Reg'l Council of Carpenters*, 324 F. Supp. 3d 293, 309 (D. Conn. 2018) (quoting XI Phillip E. Areeda & Herbert Hovenkamp, et al., *Antitrust Law* ¶ 1823, at 199 (2d ed. 2005)).

Success Systems brings this Section 2 claim only against Skupos.

Skupos argues Success Systems cannot meet the threshold requirements of pleading "harm to competition and not merely a competitor" and delineating "a properly defined, relevant market that includes all reasonably interchangeable goods." Skupos Mem. at 7. In its view, determining a relevant market "requires identifying both the relevant product market as well as the relevant geographic market[.]" *Id.* at 11. And the relevant market proposed by Success "consists of one product sold in one type of market—tobacco rewards programs available in convenience stores attached to Shell stations," *id.* at 12-13, to which the "lock-in" theory

52

regarding a single brand relevant market does not apply, *id.* at 15-16. In Skupos's view, Success Systems "attempts to define a product market that fits Plaintiffs' personal injury as opposed to a relevant market that meets antitrust pleading standards—one that includes all reasonably interchangeable products and is thus designed to test harm to competition and not merely a competitor." *Id.* at 17.

Skupos also argues that Success Systems fails to plead the elements required for a violation of Section 2 of the Sherman Act: "that there is monopoly power in the relevant market and (2) the monopoly was willfully acquired or maintained through anticompetitive means." *Id.* at 18. In its view, nothing in the Complaint alleges that Skupos has monopoly power over a market share of more than 50%. *Id.* Skupos also argues that Success Systems fails to plead "factual allegations to support any monopolistic intent" as required under Section 2 of the Sherman Act, *id.* at 21, and has no factual allegations supporting monopoly power, *id.* at 8. Finally, "Plaintiffs have no meaningful response to the actual agreement between Skupos and Excentus, which reveals the non-exclusive nature and short-term duration of the agreement." *Id.* at 9. In Skupos's view, despite knowing the nature of the agreement, Success Systems claims it is entitled to discovery on the conspiracy and exclusive dealing claims, relying on allegations pled on information and belief. *Id.*

Success Systems argues in response that "the relationship between Excentus and Skupos is a question of fact that will be explored in discovery and ultimately determined by a trier of fact[,]" that defining a relevant market is a fact-intensive inquiry, that it has plead a relevant market with reference to interchangeability and cross-elasticity, and that a single-brand market exists here.  Pl. Opp'n Skupos at 5-12. In its view, by pleading a relevant market (the Shell Fuel

Rewards tobacco rewards market) and alleging Excentus and Skupos "control 100% of this market," Success Systems has adequately alleged monopoly and market power. *Id.* at 13-14.

The Court disagrees.

"Monopoly power under § 2 requires, of course, something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 481. "Monopoly power is 'the power to control prices or exclude competition.'" *Geneva Pharm.*, 386 F.3d at 500 (citation omitted). "It can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Id.*

As discussed above, however, Success Systems has failed to plausibly allege a single-brand relevant market. While Success Systems alleges that "Excentus and Skupos' practices have harmed competition in Shell Fuel Rewards tobacco rewards market . . . [and] have driven prices and fees out of step with the broader market," Am. Compl. ¶ 114, this conclusory allegation is entitled to no weight and fails to provide the plausible entitlement to relief required, *see Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."). Indeed, Success Systems's arguments regarding monopolization fail for the same reasons that its arguments about market power and the relevant market have failed above: the absence of plausible and actionable allegations regarding Skupos's share of the relevant general tobacco rewards market, a market, as discussed above, that extends far beyond the Shell Fuel Rewards program. *See id.* ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Accordingly, Success Systems's claim under Section 2 of the Sherman Act against Skupos will be dismissed.

### E. State Law Claims

Supplemental or pendant jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Under federal law, "district courts may decline to exercise supplemental jurisdiction" if, as is the case here, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.").

Because the Court will dismiss any viable federal claim brought against Skupos, the Court declines to exercise supplemental jurisdiction over any remaining state law claim against Skupos. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

As a result, Success Systems's state law claim against Skupos will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Excentus's motion to dismiss for failure to state a claim or in the alternative transfer venue is **GRANTED** to the extent Excentus argues Success Systems failed to state a claim; the motion is **MOOT** to the extent Excentus seeks to transfer venue. Excentus's motion to dismiss for lack of jurisdiction and improper venue is **GRANTED**. Skupos's motion to dismiss for failure to state a claim is **GRANTED.**

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 1st day of February, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE